# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>URIEL SORIA-OCAMPO<br>RAPHAEL CAMPUZANO-BENITEZ | Case No.  15-CR-367-3<br>          15-CR-367-4<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION

On July 2015, the Grand Jury returned a two-count indictment [11] charging six individuals with conspiracy to distribute and possess with the intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. At this point in the case, three defendants, Cesar Antonio Perdomo (1), Gilberto Nunez-Galeana (5), and Julio Cesar Nunez-Galeana (6), have pled guilty and been sentenced, and one defendant, Marco Camacho (2), is currently preparing for trial. The remaining two defendants, Uriel Soria-Ocampo (3) and Raphael Campuzano-Benitez (4), have pled guilty without plea agreements with the Government, and await final sentencing.

As part of the ongoing sentencing proceedings for these last two defendants, this Court must determine the relevant drug quantity attributable to each defendant. As to Ocampo, the probation department recommends that this Court

attribute to him a drug quantity of at least 500 grams, but less than two kilograms of cocaine, resulting in an initial base offense level of 24. *See*, Ocampo Presentence Investigation Report (Ocampo PSR), [201], at ¶19. The Government objects to this recommendation, and asserts that Ocampo's base offense level should be the same as his coconspirators at level 30; thus reflecting the final amount of the cocaine transaction he helped to arrange, namely, five kilograms. As to Benitez, the probation department recommended a drug quantity consistent with the Government's version, resulting in an initial base offense level of 30. *See*, Benitez Presentence Investigation Report (Benitez PSR), [197], at ¶18. Defendant Benitez objects to the drug amount in his PSR, and asserts that his base offense level should be 24. Given the overlapping evidence regarding the drug quantity attributable to each defendant, this Court held a joint evidentiary hearing on July 18, 2017.

In light of the record, including the evidence presented at the July 18th hearing and the subsequent proceedings held November 28th, the submissions and arguments of the parties, and the undisputed portions of the PSR as to each defendant, this Court makes the following findings regarding the relevant drug quantity attributable to each defendant.[1] This memorandum supplements any oral

---

[1]At the evidentiary hearing, defense counsel for both Ocampo and Benitez vigorously cross-examined the testimony of the cooperator Cesar Antonio Perdomo, and attacked this evidence both as to his motivations for testifying falsely and his various inconsistent statements. This Court has, of course, considered this cooperator testimony with caution and great care. This Court also notes that the Government does not rely on this testimony alone to support its recommendations regarding the drug quantity attributable to each defendant; and the record here includes numerous recorded undercover conversations, the sworn plea colloquies of several coconspirators, the undisputed portions of the PSRs of Ocampo and Benitez, and the reasonable inferences to be drawn therefrom.

2

rulings that this Court has made, or will make, at the sentencing proceedings for Ocampo and Benitez.

## I. Drug Quantity Findings as to Each Defendant

### A. Applicable Standard

At sentencing, the government must establish the relevant drug quantity by a preponderance of the evidence. *United States v. Cox,* 536 F.3d 723, 729 (7th Cir. 2008). In the case of jointly undertaken criminal activity, like the drug conspiracy here, a defendant may be held accountable for all "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Soto-Piedra,* 525 F.3d 527, 531 (7th Cir. 2008); U.S.S.G. § 1B1.3 (a)(1)(B). Specifically, each conspirator remains responsible "not only for drug quantities directly attributable to him" but also for amounts involved in conduct by coconspirators that "were reasonably foreseeable" to him, provided that conduct remains within the scope of the jointly undertaken criminal activity. *United States v. Acosta,* 534 F.3d 574, 585 (quoting *United States v. McLee,* 436 F.3d 751, 765 (7th Cir. 2006)). In considering jointly undertaken criminal activity, the actions of coconspirators that "a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity." *Acosta*, 534 F.3d at 533 (citing U.S.S.G. § 1B1.3 cmt. n.2). The Government, however, need not prove the defendant's actual knowledge of the full details of his coconspirators' actions, because the "assist or agree to promote" language of the *Soto-Piedra* case does not trigger a heightened standard—it is simply "another way

3

of saying that the mere foreseeability of another's conduct" is not sufficient, by itself, to "bring that conduct within the scope of a defendant's jointly undertaken criminal activity." *United States v. Salem*, 597 F.3d 877, 886 (7th Cir. 2010).

In applying the above standard, this Court must first make a preliminary determination of the scope of the criminal activity each defendant agreed to jointly undertake. *United States v. Fox,* 548 F.3d 523, 531-32 (7th Cir.2008); *United States v. Thomas,* 199 F.3d 950, 953 (7th Cir.1999); U.S.S.G. § 1B1.3 cmt. n.2 ("In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake *(i.e.,* the scope of the specific conduct and objectives embraced by the defendant's agreement)."). This Court must then make a two-part determination of whether the conduct of others was *both* in furtherance of that joint criminal activity *and* reasonably foreseeable to the defendant in connection with the joint criminal activity. *Fox,* 548 F.3d at 532; *Thomas,* 199 F.3d at 953; U.S.S.G. § 1B1.3(a)(1)(B).

In making the relevant drug quantity determination, a sentencing court may "rely on information that has 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Pulley,* 601 F.3d 660, 665 (7th Cir. 2010) (quoting *United States v. Rollins,* 544 F.3d 820, 838 (7th Cir. 2008)). When a court relies upon information contained in a presentence report, "the defendant bears the burden of showing that the presentence report is inaccurate or unreliable" and a defendant's "bare denial of information in a presentence report is insufficient to

4

challenge its accuracy and reliability." *United States v. Heckel,* 570 F.3d 791, 795 (7th Cir. 2009) (quotation omitted); *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010). Indeed, only when the defense objection "creates real doubt as to the reliability of the information" in the presentence report does the Government bear "the burden of independently demonstrating the accuracy of the information." *Heckel*, 570 F.3d at 795-96.

### B.  Scope of Joint Criminal Activity (Both Ocampo and Benitez)

Here, the "jointly undertaken criminal activity" did not involve multiple narcotics transactions occurring over time with differing groups or subsets of conspirators. Instead, the specific conduct and conspiratorial objectives embraced by both Ocampo and Benitez consisted of serving as brokers for a single wholesale cocaine transaction between mid-level suppliers (Gilberto Nunez-Galeana and Julio Cesar Nunez-Galeana) and representatives [Cesar Antonio Perdomo and Marco Camacho] of purported wholesale buyers within the greater Chicago area. When Ocampo and Benitez agreed to join this endeavor, the parties had not yet decided upon an exact amount of drugs for the deal. Accordingly, Ocampo and Benitez may never have known (as both claim) the final amount of drugs to be delivered at the exchange, but they did not need to know it. Among other evidence, the recorded conversations themselves confirm the final five-kilogram amount, but knowledge on the part of Ocampo and Benitez of this exact quantity is not required, because these two defendants planned to earn essentially a finder's fee for their work on deal, rather than a percentage commission based upon the final amount of the

5

transaction. There is no requirement in the law that every joint venture come with an exact drug quantity—in some cases, the joint venture will entail a specific amount, and in others the precise amount will not be exactly specified. In this particular case, given the nature and objectives of the arrangement, the resulting five-kilogram shipment of cocaine falls well within the scope of the criminal activity both Ocampo and Benitez agreed to jointly undertake, even if they did not know (or need to know) all of the final details of the drug deal that they themselves brokered. Clearly, the exact quantity of that wholesale-level transaction changed over the course of the negotiations, but there exists no convincing evidence in the record that somehow the scope of the jointly undertaken criminal activity was ever restricted to no more than one kilogram.[2] To the contrary, the evidence shows that all of the conspirators joined together to effectuate a wholesale transaction consistent with the final decision to sell five kilograms of cocaine; and defendants Ocampo and Benitez served as the key line of communication between both sides of the deal. The record also underscores the nature and scope of this type of venture, given the large amount of drugs recovered from the stash house (which exceeded the final amount set for the delivery), and the fact that conspirators voiced a desire to engage in future business on a similar multi-kilogram scale.

---

[2]Based on the record, the one kilogram of cocaine recovered in plain view, and the recovered text message instructing conspirators to put "one out on the bed" from the hiding place at the stash house, remain consistent with the parties planning to test the quality of the cocaine before actually exchanging the full shipment and purchase price.

6

### C. Final Amount "in Furtherance of" Joint Criminal Activity (Both Ocampo and Benitez)

Given the record, this Court finds that the final five-kilogram transaction was "in furtherance of" the criminal activity both Ocampo and Benitez agreed to jointly undertake. Indeed, the undisputed portions of the record show that Ocampo and Benitez brokered this deal themselves, and it constituted the desired result of the joint criminal activity at issue.

### D. Final Amount "Reasonably Foreseeable" in Connection with Joint Criminal Activity (Both Ocampo and Benitez)

Given the record, this Court finds that the final five-kilogram transaction was "reasonably foreseeable" in connection with the criminal activity both Ocampo and Benitez agreed to jointly undertake. Once again, Ocampo and Benitez brokered this deal themselves, and it flowed as the natural and intended consequence of their actions.

### E. Individual Drug Quantity Attributable to Defendant Ocampo

Based upon the record, this Court finds that the Government has independently demonstrated the accuracy of its recommendation, and has established the relevant drug quantity as to Defendant Ocampo by a preponderance of the evidence; namely, an offense involving at least five kilograms, but less than fifteen kilograms of cocaine, resulting in a base offense level of 30.

### F. Individual Drug Quantity Attributable to Defendant Benitez

Based upon the record, this Court finds that the Government has independently demonstrated the accuracy of its recommendation, and has

established the relevant drug quantity as to Defendant Benitez by a preponderance of the evidence; namely, an offense involving at least five kilograms, but less than fifteen kilograms of cocaine, resulting in a base offense level of 30.

## II.     Conclusion

In light of the record, including the evidence presented at the 7/18/2017 and 11/28/2018 hearings, the Court makes the individual drug findings noted above as to Defendants, Uriel Soria-Ocampo (3) and Raphael Campuzano-Benitez (4). All other dates and deadlines to stand.

Date:  January 24, 2018

ENTERED:

_____
John Robert Blakey
United States District Judge